*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ESTATE OF JOHN ALBERT PIIPPO.

---

ANDREW JAY THAV, Personal Representative of
the ESTATE OF JOHN ALBERT PIIPPO and
JESSICA PIIPPO,

        Appellees,

v

VIRGINIA WHEELER PIIPPO,

        Appellant,

and

TED DIMITRI, Personal Representative of the
ESTATE OF KATHLEEN DIMITRI

        Other Party.

UNPUBLISHED
August 17, 2023

No.   362103
Washtenaw Probate Court
LC No.   19-000364-DE

---

Before:  O'BRIEN, P.J., and CAVANAGH and MARKEY, JJ.

PER CURIAM.

Appellant, a daughter of the decedent John Albert Piippo (Piippo), appeals as of right an order entered by the probate court on June 17, 2022 approving the sale of real estate following the filing of a petition for approval of that sale by the successor personal representative of Piippo's estate, Andrew Jay Thav.  We affirm.

## I.  BACKGROUND

Piippo died on March 23, 2019.  He was survived by three heirs: his daughters, appellant and Kathleen Dimitri (Kathleen), as well as his granddaughter, Jessica Piippo (Jessica).  On April 5, 2019, appellant filed an application for informal probate—indicating that her father died intestate—and requested to be appointed the personal representative of her father's estate.  The

-1-

request was granted and letters of authority were issued on April 19, 2019. On June 3, 2019, an attorney, Andrew Jay Thav (Thav), filed an appearance on behalf of Jessica.

The relevant property at issue in this case included three pieces of real property: (1) a residence located at 13340 Firesteel Road, Ontonagon, Michigan; (2) vacant land in Ontonagon, Michigan, and (3) a second piece of vacant land in Ontonagon, Michigan. Located on the residential property were a pole barn, sheds, farm equipment, and motor vehicles.

On July 19, 2019, appellant, as personal representative of Piippo's estate, filed an inventory of the assets of the estate stating that it was "a complete and accurate inventory of all the assets of the estate and the fair market valuations as of 03/23/2019." The document that appellant signed and submitted stated: "I declare under the penalties of perjury that this inventory has been examined by me and that its contents are true to the best of my information, knowledge, and belief." The inventory listed the value of all three real properties in Ontonagon, Michigan as $117,700. The inventory stated that the contents of the barn on the Ontonagon property consisted of "non operable [sic] farm equipment & junk vehicles." The "gross value" was noted to be "scrap" of unknown value. A "non operable [sic] 1988 GMC pick up [sic] truck" was also listed and its gross value was noted to be "junk" with zero value. The estate fee calculated by the probate court was based on the value of the assets listed in the inventory prepared by appellant.

On September 13, 2019, attorney Thav filed an appearance on behalf of Kathleen. Through attorney Thav, Jessica and Kathleen sought the removal of appellant as personal representative of Piippo's estate and the appointment of a successor personal representative, as well as the conversion from an unsupervised informal estate to a supervised formal estate. The petition seeking a supervised administration of the estate stated that appellant failed to serve on them a copy of the inventory, and was being "very secretive with regard to matters relating to the estate" in that she refused to provide to them any information regarding the administration of Piippo's estate.

On October 7, 2019, appellant, through retained counsel, filed a response to the petitions, primarily denying the allegations and requesting that the probate court deny the relief requested by Jessica and Kathleen. Appellant attached as exhibits purported excerpts from text message conversations she had with Jessica and Kathleen which demonstrated their acrimonious relationships.

A hearing on the petitions was conducted on October 10, 2019. The court ordered the parties to mediation and adjourned the hearing on the petitions.

A hearing on the petitions was conducted on March 5, 2020, with attorney Thav indicating in pertinent part that appellant agreed to provide an accounting with regard to estate income and liabilities by March 31, 2020. Further, the parties agreed that appellant would retain a realtor or an appraiser within 10 days to makes determinations as to the property in Ontonagon, Michigan, including its value and whether it could be divided three ways. Because of the acrimonious relationships between the parties, they were to have no contact with each other. These agreements resolved the pending petitions and an order was entered to that effect on the same date.

On July 29, 2020, counsel for appellant filed a motion to withdraw from representation, indicating that appellant had not had contact with him for several months and had failed to pay for services despite several requests. Thereafter, counsel for Jessica and Kathleen filed a motion to show cause, stating that appellant failed to comply with the March 5, 2020 order and, on August 6, 2020, the court issued an order to show cause why appellant should not be held in civil contempt. On August 28, 2020, counsel for appellant withdrew his motion to withdraw from representation and indicated that he would continue to represent appellant.

A hearing was conducted on September 10, 2020, at which time attorney Thav argued that appellant failed to comply with the court's March 5, 2020 order. Counsel for appellant disagreed, noting in relevant part that appellant listed the Ontonagon properties for sale with a realtor—which was difficult to find in the upper peninsula where the property is located—and took pictures of the property. Appellant's counsel further indicated that several vehicles were on the property but had no idea if the estate had title or keys to any of them or even if they were operable. Attorney Thav disagreed that the accounting was complete or accurate and renewed his motion to have appellant removed as the personal representative. Attorney Thav indicated that either one of his clients could be appointed or he could be appointed so that this estate matter could be resolved. Appellant's counsel argued that they could not find anyone to go to the upper peninsula and appraise or survey the Ontonagon property; it was not financially feasible for the estate. The probate could ordered an evidentiary hearing on the motion to show cause and on the petition to remove appellant as personal representative.

On September 21, 2020, appellant filed, in pertinent part: an account detailing the income and liabilities of the estate; a petition to allow the account; various receipts, and an amended inventory which indicated that the inventory value of the Ontonagon properties was $117,700. She also attached several documents, including the purported real estate sales contract she entered into three days before with regard to the Ontonagon properties, listing the properties for $160,000.

On September 21, 2020, an evidentiary hearing was conducted on the motion to show cause and on the petition to remove appellant as personal representative. Appellant was the only witness. In pertinent part, appellant testified that she did not get a survey of the Ontonagon property but went there, took pictures, and hired a realtor to get a fair market value sale of the property. The March order allowed for either the retention of a realtor or surveyor, but appellant did not have it surveyed because it is very expensive. The property was listed for sale with Domitrovich Real Estate for $160,000 and that listing agreement was dated September 18, 2020, three days before this evidentiary hearing. Appellant testified that her husband had accompanied her to the property to help her get the buildings open. Appellant admitted that she billed the estate for almost 1,100 hours of fiduciary time at $25 an hour, totaling almost $27,000 but never provided an itemized billing statement in that regard.

Following appellant's testimony, the court concluded that it was in the best interests of the estate to remove appellant as personal representative. Appellant disregarded the court's order and did not perform her duties for the estate in a timely manner. Attorney Thav was appointed as successor personal representative. The court further found that appellant was in contempt for not complying with the March 2020 order in a timely manner and she was ordered to provide documentation for her fiduciary fees. Appellant was also ordered to return to the estate a check for over $20,000 that she had not yet cashed which was purportedly in payment of her fiduciary

fees. On September 21, 2020, an order was entered consistent with the court's holdings. On September 29, 2020, an order was entered appointing attorney Thav as successor personal representative.

On November 12, 2020, appellant, through new counsel, filed an amended inventory of decedent's estate. In relevant part, appellant listed the three real properties located in Ontonagon separately, noting that the residential property had a value of $147,100; one piece of vacant land had a value of $57,600; and the second piece of vacant land had a value of $30,700. Appellant again listed the contents of the Ontonagon barn as being "non operable [sic] farm equip & junk vehicles," having a value of zero. Two pick-up trucks, one vehicle, and two trailers were also listed—all having a value to be determined. Appellant again sought fiduciary fees at a rate of $25 an hour for driving to Ontonagon (24 hours) and inventorying (6 hours) "the Ontonagon pole barn, out sheds and the farm of John Albert Piippo . . . ."

At a hearing conducted on January 4, 2021, attorney Thav advised the court that Kathleen had passed away and her interests were being represented by the personal representative of her estate, Ted Dimitri. Dimitri subsequently retained an attorney.

A hearing was conducted on April 28, 2021 with regard to the final account submitted by appellant as personal representative, as well as for sentencing appellant on the court's finding of civil contempt. During discussions, attorney Thav indicated that appellant wanted to purchase the Ontonagon properties and wanted an appraisal done but the cost would be about $1,000. She requested that the estate pay the entire cost of the appraisal—not half as he suggested—but Thav did not think the estate should pay for that expense and instead would just list the property with a realtor if she would not agree to pay half of that cost. Appellant's counsel indicated that appellant should not have to pay any portion of the fee for an appraisal. Appellant's sanction for the finding of contempt was that her fiduciary fees would be reduced by $3,796.94. An order allowing accounts was thereafter entered by the court consistent with its rulings.

On March 4, 2022 attorney Thav, as personal representative of the estate, filed a petition for approval of the sale of all three Ontonagon real properties for $230,000 to appellant. That petition was subsequently withdrawn.

On May 25, 2022, attorney Thav, as personal representative of the estate, filed a petition for approval of the sale of all three Ontonagon real properties to MKEMP LLC for $230,000.

On June 7, 2022, appellant filed a response to the petition for approval of the sale of the Ontonagon real properties, arguing that the sale would also include all personal property located in the sheds and a pole barn—the contents of which were unknown. Appellant claimed that there were vehicles, trailers, and pieces of farm equipment, as well as other personal property that had not been given a fair market value contrary to MCL 700.3706 and MCL 700.3708. Moreover, appellant argued, she was the legal owner of a 1972 Ford Bronco located in the pole barn. Accordingly, appellant requested that the court deny the petition for approval of the sale, order that an inventory and valuation of the personal property be conducted, and order that appellant be permitted to retrieve her Bronco.

On June 15, 2022, appellant filed a brief for the June 17, 2022 evidentiary hearing to occur regarding the approval of the proposed account of the fiduciary, attorney Thav, as well as on the petition for approval of the sale of the Ontonagon properties. Appellant argued, in pertinent part, that the court should not approve the sale of the properties because it included the sale of all personal property and the value of such property was unknown. Further, the proposed sale would include the sale of appellant's 1972 Ford Bronco which she wanted returned to her possession. Accordingly, appellant requested that the petition for approval of the sale be denied and that a written appraisal be conducted of the real and personal property.

An evidentiary hearing was conducted on June 17, 2022. Appellant's counsel argued that appellant was opposing the sale of the Ontonagon properties and all of the personal property contained on the properties without a proper inventory and valuation being performed. The first witness was the realtor for the Ontonagon properties, Adam Taivalkoski. The Ontonagon properties consists of three different parcels totaling 273.5 acres. It was listed for sale in September 2021. An offer to purchase was received from appellant in December 2021 for the amount of $230,000. The properties would be sold as-is with all the junk, trash, and debris because it was very expensive to remove everything and the house was about to fall over. Appellant's offer was subject to a satisfactory appraisal. The purchase agreement at issue in this case and up for the court's approval contained nearly identical terms as appellant's purchase agreement but was not subject to an appraisal. Taivalkoski testified that appellant allegedly had an appraisal performed on the property but—despite asking for it numerous times, he had never seen a copy of it. But Taivalkoski was told that the appraised value was $150,000. Thereafter, he received a revised offer for $150,000 from appellant but never received a copy of the alleged appraisal. Taivalkoski indicated that when deciding a fair price for a property, the offers received for it are relevant as to the determination of reasonableness. Appellant's offer was declined.

Subsequently, a cash offer was received from Mark Kemppainen for $230,000 for everything on the property. Appellant was then provided a courtesy opportunity to match or beat that offer and she made no such offer. About a month before this evidentiary hearing, appellant claimed for the first time that she had a Ford Bronco on the property or in the pole barn building. Appellant was then offered the opportunity to remove that vehicle and Kemppainen was apprised of that fact. The first time that Taivalkoski heard that appellant took the position that all of the personal property had to be appraised for its value was the day of this evidentiary hearing. He had hired a locksmith to re-key the pole barn before listing the property but the locksmith would not do the job because of concerns of structural stability; he felt it was unsafe. There was a big hole in the roof and other issues. Other locksmiths declined as well. He knew that there were about 20 motor vehicles outside in the field but did not know what was in the pole barn. Those vehicles would bring the value of the overall property down because they were an eyesore and, at scrap metal prices, it would be a job of itself to get rid of those vehicles. Taivalkoski testified that appellant was given the opportunity to go and retrieve her personal property, but she requested to come on Memorial weekend and he was unavailable. Taivalkoski believed the offer to purchase for $230,000 by Kemppainen was a fair and reasonable price for the Ontonagon properties. They are actually getting about $850 an acre which was about a $100 an acre more than comparable properties in the area had sold for.

On cross-examination, Taivalkoski testified that the pole barn had a big hole in the roof, the house was dilapidated, and there were two or three small sheds on the property but all of the

-5-

buildings were locked so he could not see inside them. He did see inside the front door of the house and there was what appeared to be junk inside, "like a house that's been sitting there for a long time." Taivalkoski said "it's common for farm-type properties like this to sell [with] abandoned vehicles and junk just because of the cost of removing it." In setting the sale price for the property, a lot of considerations were involved including that there were several old vehicles on the property, there were swampy areas and beaver ponds on it, the house was in disrepair with a big hole in it plus its foundation wall was caved in entirely, and the pole barn had shifted structurally on a side of the building plus there was a big hole (10 by 15 feet in size) in the roof. He attempted to have the pole barn door opened so he could see inside it before he listed the property but the only locksmith that he was able to hire would not open the door because he felt it was unsafe due to the instability of the building. Taivalkoski absolutely considered appellant's offer of $150,000 a lowball offer. The proposed purchaser of the property, Kemppainen, never asked him for permission to look inside the buildings on the property but said there was a piece of siding torn off of the pole barn which allowed him to look inside and see a Ford Bronco. The purchase agreement specifically stated that the buildings would not be opened for inspection before purchase. That provision was included because Taivalkoski did not know what was in the buildings, he could not get the locks opened, and the buildings were structurally unsound. The purchaser of the property was told that appellant wanted her Ford Bronco from the property and he was agreeable.

At the conclusion of Taivalkoski's testimony, attorney Thav rested his case in support of the petition to approve the sale of the Ontonagon properties and moved for a directed verdict on the issue. The court apparently took the matter under advisement and allowed appellant's counsel to present evidence.

Appellant's counsel called the proposed purchaser of the property as a witness, Mark Kemppainen. Kemppainen testified that he knew the property was 273 acres. He knew that two of the buildings on the property had already fallen down. The foundation of the house was bowed in and about ready to fall down. The pole barn had about a 9 by 30-foot hole in the roof; the wall running parallel to the road was unstable and not straight; and the roofline was not straight. The building was unstable. He knew that there were semi-trailers on the grounds around the building but did not know what was in them. He looked into the windows of the house and the ceiling was down inside the house. He looked into the pole barn building through a hole where a piece of metal sheeting had been bent back and it was dark inside but he thought he saw a Ford Bronco, a bulldozer, and a lot of junk. There was a tractor outside. He agreed that appellant could have her Ford Bronco after he saw that the title was in her name. All of the vehicles on the property had been parked for 20 to 25 years probably so he did not know what kind of condition they were in and the vehicles inside the barn looked to be in rough shape but be could not see them too well from outside.

Appellant's counsel then called attorney Thav as a witness. He testified that he only learned about a month before that appellant owned the Ford Bronco; that is when any evidence of that fact was produced. To determine the value of the real property at issue, he hired a realtor who was very reputable and passed a background check and interview. He had spoken with the realtor that appellant claimed she had retained the day prior to her removal as personal representative but appellant had, in fact, never signed the listing agreement with that realtor. Attorney Thav was advised by the realtor he retained, Taivalkoski, that the yard of the property was full of junk or old

vehicles that appeared to have been broken into, were rusted out and had broken windows. It was like a junk yard with a bunch of junk. He knew there was a pole barn on the property but had not been inside and did not know what was inside. A locksmith had been hired—the only one who would go to the property—and determined that it was far too dangerous to try to open up the pole barn and go inside. According to what he had been told, a construction company would have had to be hired to deconstruct the pole barn piece by piece because of the dangerous nature of the condition of the building and he did not believe that it was in the best interest of the estate to spend those funds and purchase the necessary liability insurance for such an undertaking. As far as he knew, the barn contained 20 to 40-year-old junk cars and maybe farm equipment, and other junk and was not worth the tens of thousands of dollars it would have cost to access that unstable building safely. He based his opinions on his 27 years of experience handling probate matters exclusively. And he clarified that appellant could retrieve her Ford Bronco from the property. The potential buyer, Kemppainen, then stated to the court that he would get the Bronco out of the building for appellant after the deal closes. Attorney Thav repeated that he had "no intention of taking upon the liability, the undertaking, and the expense of opening up that pole barn before selling the property . . . ."

On cross-examination of attorney Thav, he testified that he offered all of the heirs of the estate an opportunity to buy the Ontonagon properties but no one except appellant made an offer and she was the only one who objected to this sale going forward. Appellant had made an offer of $230,000 for the property—the same terms at issue in this hearing—and that offer was accepted but she later rescinded that offer, ostensibly because of an appraisal she had performed, and submitted a revised offer of $150,000. Appellant had been the personal representative of the estate for about 19 months and had listed on her inventory submitted to the court that the pole barn contents consisted of non-operable farm equipment and junk vehicles with a zero-dollar value. In fact, her final accounting did not list any of the vehicles sitting outside in the fields, likely because they were junk and could not even be proved to be owned by the estate. After he had received the offer to purchase at issue, he gave appellant another opportunity to meet or beat the purchase price being offered and she failed to do so; therefore, he proceeded with the sale at issue.

At the conclusion of the evidentiary hearing, the probate court rendered its opinion. The court noted that the issue came down to whether the personal representative of the estate appropriately accepted the offer to purchase the property without knowing what was in the pole barn. The court stated:

> Looking at the pictures that were provided, it is exceedingly far more likely that there is nothing in that pole barn but junk. The pole barn's falling down, there's a hole in the roof. It is in a remote location to expend the funds to figure out how to safely get in the pole barn. To make that determination that that is not a benefit to the estate was a reasonable determination to make on the part of the personal representative. . . . [T]hat was a reasonable decision, cost-effective decision to make.

> In addition to that, that's enough, but in addition, [appellant] was personal representative from April of 2019 until September of 2020. That's two summers she had to get in that pole barn. Two years that presumably it was in a better condition than it was two years later. She listed - - I didn't go through all of them,

but at least two inventories she had, the July '19 inventory she lists the three Ontonagon properties worth 117, and the barn, stuff in the unopened barn "scrap" on the September '20 inventory she listed again the properties as a 117 - - value of 117,000, and doesn't even mention the property inside the pole barn.

So from every information here, she did nothing to protect that property while she was personal representative. She did nothing to value the property. She didn't even include it on the inventory and did nothing to protect it and/or retrieve it. So that, in addition to just the fact that it was a reasonable decision to make, cost-effective decision to make for the estate, I am going to approve the sale of the property.

On that same date, June 17, 2022, an order was entered approving the sale of the Ontonagon properties for the sum of $230,000 to MKEMP LLC.

Thereafter, appellant filed a motion for stay of the order regarding the sale of real estate, which was denied by order entered on July 8, 2022 following a hearing on the motion. At the hearing, the personal representative noted that he was unable to secure any liability insurance (three companies refused) on the property—because of its dangerous and unsafe condition—which made the estate vulnerable to liability if someone went into the pole barn to conduct an inspection or inventory and it fell down and killed the person. Following arguments, the court stated:

I would agree that the normal course would absolutely be that a personal representative would inventory the personal property prior to a sale, and obviously that's, [sic] would be the preferred procedure. So I understand that. But the fact that she was personal representative for 17 months and had time herself to inventory that property, never did, and her inventory called the value of that property zero in her inventory, she has from day one . . . . [S]he had to be show caused to do anything with the property. So to now come in and, again, just continuing to obstruct.

All the testimony supports the fact that the chances of anything of significant value being in that pole barn is significantly low. We had testimony about a hole in it so the weather has gotten in there. It -- the only thing that was presented would indicate that there's not much of value in there.

Also that they did try to get the locksmith to come out. They did attempt to get in the barn. Did have a locksmith come out and get into the barn, but he refused to even open it because it was too dangerous to even open.

I think it is within the personal representative's decision-making authority to be able to abandon that property and/or include it, this is -- he's getting something for it, he's included it in the sale, so it's not really even an abandonment. But without taking the time to inventory it. I just think it is going to cause harm to the estate to lose this sale. It is a unique piece of property that is not -- you know, you're selling a house in Ann Arbor that you're going to get another buyer the next day. I am going to deny leave here to stay the proceedings.

Appellant then filed this appeal. Appellant also filed in this Court a motion for stay pending appeal which was denied. *In re Piippo Estate*, unpublished order of the Court of Appeals, entered July 14, 2022 (Docket No. 362103). And appellant filed a motion to expand the record on appeal, which was denied without prejudice. *In re Piippo Estate*, unpublished order of the Court of Appeals, entered December 19, 2022 (Docket No. 362103). Subsequently appellant filed a renewed motion to expand the record on appeal, which was denied. *In re Piippo Estate*, unpublished order of the Court of Appeals, entered July 19, 2023 (Docket No. 362103).

## II. ANALYSIS

Appellant argues that the probate court reversibly erred by authorizing the sale of the Ontonagon real properties, including all of the personal property, because the personal representative failed to satisfy his obligations under MCL 700.3706 and MCL 700.3708 to inventory and value that personal property. We disagree.

### A. STANDARD OF REVIEW

MCL 600.866(1) provides: "All appeals from the probate court shall be on a written transcript of the record made in the probate court or on a record settled and agreed to be the parties and approved by the probate court. An appeal shall not be tried de novo." See also MCR 5.802(B)(1). "The standard of review on appeal in cases where a probate court sits without a jury is whether the court's [factual] findings are clearly erroneous." *In re Bennett Estate*, 255 Mich App 545, 549; 662 NW2d 772 (2003); see also *In re Webb H Coe Marital & Residuary Trusts*, 233 Mich App 525, 531; 593 NW2d 190 (1999). A factual finding is clearly erroneous if this Court is definitely and firmly convinced that the probate court made a mistake. *In re Townsend Conservatorship*, 293 Mich App 182, 186; 809 NW2d 424 (2011) (citation omitted). The probate court's substantive and dispositional decisions are reviewed for an abuse of discretion. *In re Temple Marital Trust*, 278 Mich App 122, 128; 748 NW2d 265 (2008); *In re Weber Estate*, 257 Mich App 558, 560; 669 NW2d 288 (2003). An abuse of discretion occurs when the probate court chooses an outcome outside the range of reasonable and principled outcomes. *In re Temple Marital Trust*, 278 Mich App at 128. We review de novo issues of statutory or court rule construction and application. *In re DeCoste Estate*, 317 Mich App 339, 345; 894 NW2d 685 (2016).

### B. PETITION FOR APPROVAL OF SALE

"A personal representative is a fiduciary who shall observe the standard of care applicable to a trustee . . . ." MCL 700.3703(1). The personal representative has a duty to act "as expeditiously and efficiently as is consistent with the best interests of the estate." *Id*. Another duty that a personal representative has, pursuant to MCL 700.3706(1), is to "prepare an inventory of property owned by the decedent at the time of death, listing it with reasonable detail, and indicating as to each listed item, its fair market value as of the date of the decedent's death, and the type and amount of an encumbrance that may exist with reference to each listed item." The calculation of the probate inventory fee is based on the inventory submitted to the probate court. MCL 700.3706(2). And if the personal representative believes there is reasonable doubt about the

fair market value of a piece of property in the estate, an appropriate appraiser may be employed. MCL 700.3707. Moreover, under MCL 700.3708:

> If property not included in the original inventory comes to the knowledge of a personal representative or if the personal representative learns that the value or description indicated in the original inventory for an item is erroneous or misleading, the personal representative shall make a supplementary inventory or appraisal showing the market value as of the date of the decedent's death of the new item or the revised market value or description, and showing the appraiser or other data relied upon, if any.

In this case, appellant was the personal representative of this estate until she was removed by the probate court. In her capacity as personal representative, appellant filed an inventory of the estate's assets on July 19, 2019, as required under MCL 700.3706(1). Appellant filed that document under oath, stating that the value of all three real properties in Ontonagon, Michigan was $117,700. That inventory stated that the contents of the barn on the Ontonagon property consisted of "non operable [sic] farm equipment & junk vehicles." The "gross value" was noted to be "scrap" of unknown value. A "non operable [sic] 1988 GMC pick up [sic] truck" was also listed, and its gross value was noted to be "junk" with zero value. Based on appellant's representations, the estate fee charged by the probate court was $211.

Before appellant was removed as personal representative, she claimed that she was entitled to fiduciary expenses totaling $12,218.71. A significant portion of those fiduciary fees were accrued for one trip that she made to Ontonagon, from August 29, 2020 to August 31, 2020, including for drive time, mileage, hotel costs, bridge fare, and "hardware."[1] One of the entries included on the expense report submitted to the probate court stated: "Time to Inventory Barn, Sheds & Farm," dated for August 30, 2020, and appellant sought $150.00 ("6 hrs x $25 per hr") for that service. We further note that at the September 21, 2020 evidentiary hearing conducted by the probate court on the motion to show cause and on the petition to remove her as personal representative, appellant testified that during her visit to the Ontonagon properties when she took the inventory, her husband accompanied her to help her get inside the buildings on the property. Accordingly, to the extent that the probate court noted that appellant did not, in fact, conduct an inventory of the pole barn, sheds, and surrounding property while she was the personal representative, such a factual finding by the court was clearly erroneous.

Thus, when appellant filed an amended inventory with the probate court in September 2020, she actually had already been inside the buildings on the property on August 30, 2020, and knew what they contained. Appellant never indicated to the court that she believed there was reasonable doubt about the fair market value of the property she inventoried, and thus, never requested an appraiser as permitted under MCL 700.3707. Appellant's amended inventory listed the Ontonagon properties as, again, having a value of $117,700. No other property was listed with regard to the Ontonagon properties.

---

[1] Appellant's request for fiduciary expenses included expenses for "hardware" from Ace in the amounts of $208.94, $12.71, and $47.31. The type of "hardware" is unknown.

On November 12, 2020, after appellant was removed as personal representative of the estate, she filed another amended inventory. This inventory—without clarifying explanation—stated that the residential Ontonagon property had a value of $147,100; one piece of vacant land in Ontonagon had a value of $57,600; and the other piece of vacant land had a value of $30,700. Appellant again listed the "Contents of the Ontonagon barn" as being "non operable [sic] farm equip & junk vehicles," having a value of zero. She also listed vehicles that were outside, including two pick-up trucks, one vehicle, and two trailers with unknown value. By letter dated November 3, 2020, appellant again sought fiduciary fees at a rate of $25 an hour for driving to Ontonagon (24 hours) and stated that she "spent six hours at $25/hour, as the Personal Representative, for inventorying the Ontonagon pole barn, out sheds and the farm of John Albert Piippo . . . ."

After attorney Thav was appointed personal representative of the estate, appellant advised him that she wanted to purchase the Ontonagon properties and he submitted a petition for approval of the sale in the amount of $230,000 to the probate court. Apparently, that offer to purchase was contingent on an appraisal being performed but appellant refused to pay for half of the appraisal fee, which was estimated to be $500. Then appellant submitted a revised offer to purchase the properties for $150,000—and this was after appellant had conducted her six-hour inventory of the properties—which was declined by the estate. Thereafter, the estate received a cash offer from Kemppainen to purchase the properties for $230,000, which was accepted. When the estate sought approval of the sale from the probate court, appellant objected claiming that the value of the personal property located on the Ontonagon residential property was unknown. Following an evidentiary hearing on the matter, the probate court approved the sale.

On appeal, appellant challenges the probate court's approval of the sale of the Ontonagon properties to Kemppainen, asserting an argument that is directly contrary to her sworn statements submitted to the probate court. Appellant claims that the successor personal representative was required to "determine the nature or value of the pole barn's contents," but appellant did that when she was personal representative of the estate. As MCL 700.3706(1) states, within 91 days after appointment, a personal representative "who is not a . . . successor to another representative who has previously discharged this duty, shall prepare an inventory . . . ." Attorney Thav was a successor to appellant—who *had* discharged the duty of preparing an inventory, including an inventory of the pole barn's contents. As set forth at MCL 700.3608, although appellant was terminated as personal representative of the estate, "[t]ermination does not discharge a personal representative from liability for a transaction or omission occurring before termination . . . ." While the personal representative of the estate, appellant submitted an inventory and amended inventory to the probate court which listed the personal property on the Ontonagon properties, including in the pole barn, as basically, junk with scrap or zero value. In fact, appellant charged the estate for six hours of her time taking an inventory of the "Ontonagon pole barn, out sheds and the farm of John Albert Piippo . . . ."

The amended inventory appellant submitted to the probate court on September 21, 2020—after that August 30, 2020 six-hour inventory service appellant provided to the estate—did not even list any personal property associated with the Ontonagon properties. Appellant's second amended inventory filed November 12, 2020 still stated that the "contents of the Ontonagon barn" consisted of non-operable farm equipment and junk vehicles that had an inventory value of zero. Nonetheless, appellant argues that attorney Thav as successor personal representative of the estate had a duty to send an appraiser to the Ontonagon barn "to determine the nature or value of the pole

-11-

barn's contents" and asserts that Thav's excuse for not doing so—that the barn structure was unsafe and the contents were likely ruined because of the big hole in the roof that had been there for years—was "based on mere speculation or supposition." Like the probate court, we cannot agree with appellant. In essence, appellant is arguing that the successor personal representative had a duty to disbelieve appellant's sworn fiduciary statements about the personal property on the Ontonagon properties—which were made after she took a six-hour inventory for which she sought fiduciary fees—and hire an appraiser. Moreover, at the September 10, 2020 hearing, appellant's counsel admitted on the record that it was not financially feasible for the estate to have an appraisal of the property performed and also stated that the estate may not have title or keys to any of the several vehicles on the property.

While attorney Thav as successor personal representative of the estate had a duty under MCL 700.3708 to file a supplementary inventory "[i]f property not included in the original inventory comes to the knowledge of a personal representative or if the personal representative learns that the value or description indicated in the original inventory for an item is erroneous or misleading," there is no evidence that such was the case here. In other words, despite a lengthy evidentiary hearing, there is no record evidence that Thav was made aware of the existence of some personal property of the estate that was missed or misrepresented by appellant in the inventory documents that she filed with the probate court when she was the personal representative—and after she conducted a six-hour inventory that included all of the buildings on the properties. In light of appellant's fiduciary obligation and sworn statements made "under the penalties of perjury," attorney Thav could reasonably rely on her repeated representations to the court that there was nothing of value in the pole barn, sheds, or in the fields of the "farm."

Moreover, as personal representative of the estate, attorney Thav was empowered under MCL 700.3715(1)(k) to "[a]bandon property when, in the opinion of the personal representative, it is valueless, or is so encumbered or in such a condition as to be of no benefit to the estate." As the probate court noted, the pictures provided to the court supported attorney Thav's decision not to waste estate assets by purchasing liability insurance and hiring the necessary experts—including construction personnel to secure the structural safety of the dilapidated barn and an appraiser—to investigate and verify appellant's sworn fiduciary statements about the personal property on the Ontonagon properties. This cost-effective decision was particularly reasonable and sound considering that attorney Thav was never provided with any evidence that valuable assets existed on the properties. To the contrary, appellant's inventory submitted to the court after her six-hour investigation did not list any valuable personal property and she had only offered $150,000 to buy the properties despite her extensive in-person investigation.

In summary, the probate court did not abuse its discretion by approving the sale of the Ontonagon properties, including all of the personal property, after concluding that the successor personal representative fulfilled his duties and acted in the best interests of the estate.

Affirmed.  Appellees are entitled to costs as the prevailing parties.  See MCR 7.219(A).


/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Jane E. Markey